UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

C.O. FALTER CONSTR. CO.,

                              Plaintiff,

v.                                                          5:09-CV-565
                                                            (GTS/ATB)
CINCINNATI INS. CO.,

                              Defendant.
_____

APPEARANCES:                                    OF COUNSEL:

ANDERSON, KILL & OLICK, P.C.            FINLEY HARCKHAM, ESQ.
   Counsel for Plaintiff                         DENNIS J. ARTESE, ESQ.
1251 Avenue of the Americas, 42nd Floor
New York, New York 10020-1182

LITCHFIELD CAVO, LLP                      DANIEL G. LITCHFIELD, ESQ.
   Counsel for Defendant                       MICHAEL R. BYRNE, ESQ.
303 West Madison Street, Suite 300
Chicago, Illinois 60606

HON. GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently before the Court in this breach-of-contract action filed by C.O. Falter

Construction Company ("Plaintiff") against Cincinnati Insurance Company ("Defendant"), are

Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 25) and

Plaintiff's motion for partial summary judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 26).

For the reasons set forth below, Defendant's motion is granted in part and denied in part, and

Plaintiff's motion is granted in part and denied in part.

## <u>TABLE OF CONTENTS</u>

I.    RELEVANT BACKGROUND

      A.    Plaintiff's Claims.................................................................................3
      B.    Undisputed Materials Facts.................................................................4
            1.    Plaintiff's Contract with the County.......................................4
            2.    Sawmill Creek Incident...........................................................5
            3.    Wetzel Road Incident..............................................................6
            4.    Plaintiff's Policy Claims.........................................................7
      C.    Parties' Motions..................................................................................7
            1.    Briefing on Defendant's Motion...............................................7
            2.    Briefing on Plaintiff's Motion................................................10

II.   GOVERNING LEGAL STANDARDS........................................................11

      A.    Legal Standard Governing Motion for Summary Judgment.........................11
      B.    Legal Standard Governing Diversity Actions.......................................13

III.  ANALYSIS..................................................................................14

      A.    Whether New York or Ohio Law Governs this Diversity Action...................14
      B.    Defendant's Motion for Summary Judgment–Floater Part  Claims.............14
            1.    Definition of "Covered Property"...........................................15
            2.    Exclusions...............................................................................18
                 a.    "Earth Movement" Exclusion.......................................19
                 b.    "Faulty Workmanship"Exclusion.................................21
                 c.    "Delay" Exclusion.......................................................24
      C.    Defendant's Motion for Summary Judgment–CGL Claims.........................25
            1.    Legal Obligation to Pay..........................................................26
            2.    Defendant's Other Arguments...............................................28
      D.    Plaintiff's Motion for Partial Summary Judgment–Floater Part Claims......32
            1.    Whether Plaintiff's Losses Are "Covered Property"...........................32
            2.    Whether the "Collapse" Exception Applies..............................33
            3.    Whether the "Faulty Workmanship" Exclusion Applies.................33
      E.    Plaintiff's Motion for Partial Summary Judgment–CGL Claims.................34
            1.    Whether Plaintiff Had a Legal Obligation to Pay for Jet Grouting...34
            2.    Whether Plaintiff's Losses Arose from "Property Damage".............35
            3.    Whether the Incident at Sawmill Creek Constitutes an
                 "Occurrence".........................................................................36
      F.    Plaintiff's Motion for Partial Summary Judgment–Late Notice...................36
      G.    Plaintiff's Motion for Partial Summary Judgment–Defendant's Late
          Disclaimer of Coverage.....................................................................38

# I.    RELEVANT BACKGROUND

## A.    Plaintiff's Claims

Plaintiff filed its Complaint in this action on April 13, 2009, in New York State Supreme Court, Onondaga County.[1]  (Dkt. No. 1, Attach. 2.)  Generally, Plaintiff's Complaint alleges the following.

Plaintiff and Defendant entered into a contract for insurance ("the Policy") pursuant to which Defendant agreed to pay Plaintiff for certain property and liability losses suffered during the term of the Policy.  (*Id.* at 4.)  During the term of the Policy (May 1, 2005, to May 1, 2006), Plaintiff entered into a contract ("the Contract") with Onondaga County ("the County") to perform two construction projects.  (*Id.* at 6.)  On May 16, 2005, and October 19, 2005, Plaintiff suffered property and liability losses while it undertook its obligations under the Contract.  (*Id.* at 6-9.)  Plaintiff promptly notified Defendant of the incidents and provided proofs of loss for its claims.  (*Id.* at 9.)  On December 3, 2008, Defendant sent Plaintiff a letter denying coverage for the property and liability losses Plaintiff sustained as a result of the incidents of May 16, 2005, and October 19, 2005.  (*Id.* at 11.)  As of the date of the Complaint, Defendant had not paid any portion of the Plaintiff's losses, and refuses to do so under the Policy.  (*Id.*)

Based on these factual allegations, Plaintiff's Complaint asserts the following claims: (1) a breach-of-contract claim based on Defendant's failure to pay Plaintiff's property claim arising from the incident on May 16, 2005; (2) a breach-of-contract claim based on Defendant's failure to pay Plaintiff's liability claim arising from the incident on May 16, 2005; and (3) a breach-of-

---

[1]    On May 13, 2009, Defendant filed for removal to this Court pursuant to 28 U.S.C. § 1332(a).  (Dkt. No. 1.)

contract claim based on Defendant's failure to pay Plaintiff's property claim arising from the incident on October 19, 2005. (*Id.* at 12-13.)[2]

### B.    UNDISPUTED MATERIAL FACTS

Generally, the undisputed material facts are as follows.  (*Compare* Dkt. No. 25, Attach. 3 [Def.'s Statement of Material Facts], Dkt. No. 35, Attach. 2 [Def.'s Response to Plf.'s Statement of Material Facts], and Dkt. No. 42 [Def.'s Response to Plaintiff's Statements of Additional Material Facts] *with* Dkt. No. 29 [Plf.'s Statement of Material Facts], Dkt. No. 37 [Plf.'s Response to Def.'s Statement of Material Facts], and Dkt. No. 45 [Plf.'s Response to Def.'s Statements of Additional Material Facts].)

### 1.    Plaintiff's Contract with The County

On September 24, 2004, Plaintiff submitted a bid to the County's engineers, O'Brien & Gere ("OBG"), to be named the general contractor for the construction of (1) a new pump station at Sawmill Creek in Liverpool, New York, and (2) a wastewater treatment plant at Wetzel Road in Liverpool, New York, and (3) related buildings at both sites.  The bid called for "caissons or equal" to serve as the foundations for the structures.  However, based on soil information collected from the County and from Plaintiff's own investigation, Plaintiff ultimately proposed using a different foundation method for the Sawmill Creek pump station and the Wetzel Road wastewater treatment plant.  After bidding on (but before being awarded) the contract, Plaintiff met with OBG to discuss its proposed non-caisson foundation plan.  Subsequently, OBG approved the non-caisson foundations, and Plaintiff was awarded the Contract.

---

[2]      The Court notes that Plaintiff's Complaint includes three good-faith-and-fair-dealing claims.  (Dkt. No. 1, Attach. 2 at 13-14.)  However, the Court does not address those claims in this Decision and Order because the Court dismissed those claims on January 4, 2011 (Dkt. No. 41), pursuant to the parties' Stipulation of Dismissal (Dkt. No. 40).

### 2.    Sawmill Creek Incident on May 16, 2005

In May of 2005, Plaintiff began working on creating a sheeting pit (an excavated sub-grade area enclosed by sheet piles) at Sawmill Creek.  Plaintiff planned to create the sheeting pit by driving sheet piles into the ground to form a perimeter.  Plaintiff then planned to excavate down to the sub-grade level of 35 feet, where the foundation itself would be constructed.  The sheet piles used by Plaintiff were 60-feet tall, twenty inches wide, and one-half-inch thick, and interlocked when driven into the ground.  Once it completed the Sawmill Creek project, Plaintiff planned to reuse the sheet piles at other job sites.  By May 14, 2005, Plaintiff had driven three sides of the sheeting pit into the ground using a large piece of equipment called a vibratory hammer.

On May 16, 2005, Plaintiff returned to Sawmill Creek and observed that the ground surrounding the sheeting pit had settled, and that a corner of the old pump station, which was located ten feet from where one side of the sheeting pit was being driven, had settled approximately five to seven inches. Plaintiff stopped working immediately, and no further settlement occurred.  Plaintiff and OBG met on June 21, 2005, and discussed possible ways to secure the existing buildings from any additional settlement.  Either at or some time after this meeting, Plaintiff and OBG agreed that jet grouting, a process by which concrete and soil are pressurized together underground to create support columns, would be used to underpin the old pump station.  Plaintiff and OBG disagreed as to who should pay for any additional work. Ultimately, "under protest," Plaintiff paid for the subcontractor's jet grouting work and the additional site work required due to the incident.  After the jet grouting was complete, Plaintiff resumed work on the sheeting pit and the remainder of the work at Sawmill Creek in July 2006.

### 3.    Wetzel Road Incident on October 18, 2005

Plaintiff began its work on the wastewater treatment plant at Wetzel Road in the fall of 2005.  By October 18, 2005, Plaintiff had driven sheet piles into the ground creating a cofferdam by excavating earth from within the walls of the sheeting pit, and bracing the walls of the sheeting pit without incident.  Then, between October 18, 2005, and October 19, 2005, Plaintiff drove five test H-piles (large steel beams) into the ground from the subgrade at the site.  The H-piles punctured an aquifer that sat below the sheeting pit; and groundwater, sediment, silt, and soil escaped through the openings of the sheeting pit created by the H-piles.  Consequently, the sheet piles and bracing at one end of the sheeting pit shifted and bent.  Plaintiff was unaware of the presence of the aquifer at the time it began driving the H-piles into the ground.

Plaintiff stopped work and flooded the sheeting pit in an effort to stabilize it.  Additional deep wells were installed to dewater the sheeting pit; and, as the water level was incrementally lowered within the sheeting pit, Plaintiff repaired the original bracing and added new bracing. After the repairs and additional bracing were complete, Plaintiff continued installing the remaining H-piles and constructing the foundation for the facility.

Plaintiff and the County disagreed as to should pay for the additional work.  Plaintiff argued that the Wetzel Road site conditions (including information on groundwater) provided by the County were inaccurate, and therefore, the County should pay for the additional work.  The County however, rejected Plaintiff's request for payment and argued that Plaintiff chose inappropriate methods for construction.  Ultimately, Plaintiff paid for the additional costs.

### 4.    Plaintiff's Policy Claims

Plaintiff was insured by the Policy at the time of the Sawmill Creek and Wetzel Road

incidents.  On June 22, 2005, Plaintiff's insurance agent, the James P. Reagan Agency

("Reagan"), sent a General Liability Notice of Occurrence/Claim form to Defendant regarding

the Sawmill Creek incident ("Sawmill Creek CGL claim").  On September 6, 2007, Reagan sent

a Property Loss Notice form to Defendant regarding the Wetzel Road incident ("Wetzel Road

Floater Part claim").  On October 2, 2007, Reagan sent a Property Loss Notice form to

Defendant regarding the Sawmill Creek incident ("Sawmill Creek Floater Part claim").[3]  On

December 5, 2007, Plaintiff submitted proofs of loss to Defendant for both Floater Part claims

and a summary of claimed amounts for the Sawmill Creek CGL claim.  On December 3, 2008,

after completing its investigation, Defendant denied Plaintiff coverage for all three claims.

Familiarity with the remaining undisputed material facts, as well as the disputed material

facts, as set forth in the parties' Statements and Responses pursuant to Local Rule 7.1(a)(3), is

assumed in this Decision and Order, which is intended primarily for review by the parties.

### C.    Parties' Motions

#### 1.    Briefing on Defendant's Motion

On November 30, 2010, Defendant filed a motion for summary judgment pursuant to

Fed. R. Civ. P. 56.  (Dkt. No. 25.)  Generally, in support of its motion, Defendant asserts the

following six arguments.  First, Plaintiff did not sustain a loss that is covered under the

Installation Floater Coverage Part of the Policy ("the Floater Part").  (Dkt. No. 25, Attach. 2 at 6-

---

[3]        As discussed more completely below in Part III.F. of this Decision and Order, the
parties dispute why the Sawmill Creek Floater Part claim was not opened until October 2, 2007,
when the Sawmill Creek CGL claim was opened in June 2005.

9.)  Second, even if Plaintiff did sustain such a loss, the cause of Plaintiff's loss is one that the

Floater Part excludes from coverage.  (*Id.* at 9-14.)  More specifically, the cause of Plaintiff's

alleged loss was (a) "earth movement," (b) "faulty workmanship," and/or (c) "delay"–each of

which are excluded from coverage under the Floater Part.  (*Id.*)  Third, Plaintiff was under no

legal obligation to undertake jet grouting on the Sawmill Creek project; and therefore, pursuant

to the Commercial General Liability Coverage Part of the Policy ("the CGL"), Defendant is not

obligated to cover the costs associated with the jet grouting.  (*Id.* at 16-17.)  Fourth, Plaintiff's

losses constitute only economic losses that did not arise from "property damage," which

Defendant is not obligated to pay under the CGL.  (*Id.* at 16-18.)  Fifth, even if Plaintiff's losses

are of the kind contemplated by the CGL, coverage is barred by the "business risk" and

"professional liability" exclusions of the CGL.  (*Id.* at 18-22.)  Sixth, and finally, Plaintiff is

barred from receiving coverage by the voluntary payment provision of the CGL.  (*Id.* at 22-23.)[4]

On January 3, 2011, Plaintiff filed a response to Defendant's motion.  (Dkt. No. 38.)

Generally, in its response, Plaintiff asserts the following nine arguments.  First, Defendant

waived its right to raise the argument that Plaintiff's losses were not of the kind contemplated by

the Floater Part, because Defendant did not deny Plaintiff coverage on that ground.  (Dkt. No. 38

at 9.)  Second, Plaintiff suffered loss to "Covered Property" under the Floater Part, because that

term insures against loss of materials and supplies "used in or incidental to" construction.  (*Id.* at

10 [emphasis omitted.].)  Third, even if the Plaintiff's losses were caused by "earth movement,"

there is an applicable exception to that clause allowing for coverage of "total or partial collapse."

---

[4]      In its memorandum of law, Defendant includes arguments relating to Plaintiff's
good-faith-and-fair-dealing claims.  (*See generally* Dkt. No. 25, Attach. 2 at 23-26.)  Because
those claims were dismissed, the Court will not address Defendant's arguments relating to them
in this Decision and Order.

(*Id.* at 12.)  Fourth, Plaintiff's losses were not caused by "faulty workmanship."  (*Id.* at 13.)

Fifth, Plaintiff's losses are recoverable because they are considered "materials, including labor,

and supplies . . . used in or incidental to the construction."  (*Id.* at 18-22.)  Sixth, the County's

claim against Plaintiff for the costs of jet grouting at Sawmill Creek triggered Defendant's

obligations under the CGL. (*Id.* at 23-25.)  Seventh, Plaintiff's losses are costs it "incurred

because of the property damage it caused to [a] third-party property," rather than purely

"economic losses," as Defendant argues.  (*Id.* at 25-27.)  Eighth, neither the "business risk" nor

the "professional liability" exclusions of the CGL apply to Plaintiff.  (*Id.* at 27-30.)  Ninth, and

finally, the voluntary payment provision does not apply, because Plaintiff undertook the costs of

jet grouting after Plaintiff gave Defendant notice of the incident.  (*Id.* at 31.)

On January 10, 2011, Defendant filed a reply to Plaintiff's response.  (Dkt. No. 42.)

Generally, in its reply, Defendant reiterates the arguments it makes in opposition to Plaintiff's

motion for partial summary judgment, discussed below in Part I.C.2. of this Decision and Order.

(*Id.* at 1.)  In addition, Defendant also asserts the following five arguments.  First, Defendant

reiterates its argument that the Floater Part does not cover Plaintiff's losses, because they do not

constitute "Covered Property."  (*Id.* at 1-2, 6-7.)  Second, Defendant reiterates its argument that

the Floater Part does not cover Plaintiff's losses, because they were caused by Plaintiff's faulty

workmanship.  (*Id.* at 3-5.)  Third, Defendant reiterates its argument that Plaintiff's losses were

caused, in part, by delays, which is excluded by the CGL.  (*Id.* at 5-6.)  Fourth, Defendant

reiterates its argument that the "business risk" and "professional liability" exclusions of the

Floater Part preclude Plaintiff from coverage.  (*Id.* at 7-9.)  Fifth, and finally, Defendant

reiterates its argument that Plaintiff voluntarily paid for the costs associated with the jet grouting

at Sawmill Creek project, and therefore, the voluntary payment provision of the Floater Part

applies.  (*Id.* at 9-10.)

2.        Briefing on Plaintiff's Motion

On November 30, 2010, Plaintiff filed a motion for partial summary judgment.  (Dkt. No. 26.)  Generally, in support of its motion, Plaintiff asserts the same or similar arguments it made in opposition to Defendant's motion for summary judgment, as described above in Part I.C.1. of this Decision and Order.[5]  (Dkt. No. 30 at 9-20.)  In addition, Plaintiff asserts the following five arguments.  First, Plaintiff's losses were the cause of "an accident," which is included in the CGL's "Occurrence" provision.  (*Id.* at 26-27.)  Second, the "faulty workmanship"exclusion applies only to a defect in the "finished product."  (*Id.* at 19.)  Third, even if the "faulty workmanship" exclusion applies to bar coverage, the "collapse" exception restores coverage. (*Id.* at 21.)  Fourth, Defendant explicitly and implicitly waived its rights to deny coverage based on Plaintiff's alleged late-notice.  (*Id.* at 27-28.)  Fifth, because Defendant issued its letter disclaiming coverage "late," it has waived its right to disclaim coverage based on the Policy's conditions and exclusions.  (*Id.* at 28-29.)

On January 3, 2011, Defendant filed a response to Plaintiff's motion.  (Dkt. No. 35.) Generally, in its response, Defendant asserts the following seven arguments.  First, Plaintiff's losses constitute "equipment," "costs for reengineering, dewatering and monitoring," and "costs of 'extended general conditions'"–none of which are "Covered Property" as that term is used in the Floater Part.  (*Id.* at 4-6.)  Second, Plaintiff mischaracterizes the incidents at both Sawmill Creek and Wetzel Road in an effort to avoid the "earth movement" exclusion under the Floater Part.  (*Id.* at 6-9.)  Fourth, Plaintiff's arguments regarding the "faulty workmanship" exclusion of the Floater Part are unsupported by relevant New York case law.  (*Id.* at 10-13.)  Fifth, there is

---

[5]        Specifically, Plaintiff asserts the second, third, fourth, and eighth arguments described above in Part I.C.1. of this Decision and Order.

no evidence to suggest that the County asserted a legal claim against Plaintiff for the damage caused at Sawmill Creek.  (*Id.* at 14-16.)  Sixth, Plaintiff's losses from the Sawmill Creek incident  were not the result of an "Occurrence" as that term is used in the CGL.  (*Id.* at 16-17.) Seventh, and finally, there is sufficient evidence demonstrating that Defendant neither explicitly nor implicitly waived its rights to assert affirmative defenses based on the Policy's conditions and exclusions.  (*Id.* at 17-23.)

On January 10, 2011, Plaintiff filed a reply to Defendant's response.  (Dkt. No. 44.) Generally, in its reply, Plaintiff reasserts the following five arguments.  First, Plaintiff's losses constitute "'loss' to Covered Property" under the Floater Part.  (*Id.* at 4-5.)  Second, the Floater Part's "earth movement" exclusion does not apply.  (*Id.* at 5-7.)  Third, the Floater Part's "faulty workmanship" exclusion does not apply.  (*Id.* at 7-8.)  Fourth, Plaintiff's losses were caused by an "Occurrence" as that term is used in the CGL.  (*Id.* at 8-10.)  Fifth, Defendant waived its rights to deny Plaintiff coverage based on the Policy's conditions and exclusions.  (*Id.* at 10-13.)

## II.     GOVERNING LEGAL STANDARDS

### A.     Legal Standard Governing a Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether a genuine dispute of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).

However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson*, 477 U.S. at 248. As a result, '[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986) (citations omitted).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party willfully fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that nonmoving party is proceeding *pro se*.[6] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received not ice of the consequences of failing to properly respond to the motion for summary judgment.)[7] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a

---

[6]     *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[7]     *Cusamano*, 604 F. Supp.2d at 426 & n.3 (citing cases).

district court's procedural rules.[8]  For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has willfully failed to properly respond to that statement[9]–even where the nonmoving party was proceeding *pro se* in a civil rights case.[10]

### B.      Legal Standard Governing Diversity Actions

A federal court in a diversity case must look to the choice-of-law rules of the state in which it sits to resolve conflict-of-law issues.  *Klaxon Co. v. Stentor Elec. Mfg. Co. Inc.*, 313 U.S. 487, 496 (1941); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 71-79 (1938); *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 269-70 (2d Cir. 1992).

Pursuant to New York's choice-of-law rules, to determine the law that governs a contractual relationship between the parties, the court is to apply the "paramount interest" test, under which the court must apply the law of the state with the "greatest interest in the litigation." *Tischmann v. ITT/Sheraton Corp.*, 882 F. Supp. 1358, 1366 (S.D.N.Y. 1995) (quoting *Crescent Oil & Shipping Servs., Ltd. v. Phibro Energy, Inc.,* 929 F.2d 49, 52 [2d Cir. 1991]).  In determining which state's interest is paramount, the most significant facts or contacts are those that "relate to the purpose of the particular [substantive] law in conflict." *Tischmann,* 882 F. Supp. at 1366 (citing *Hutner v. Greene*, 734 F.2d 896, 899 [2d Cir. 1984]).

---

[8]      *Cusamano*, 604 F. Supp.2d at 426-27 & n.4 (citing cases).

[9]      Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 7.1(a)(3).

[10]     *Cusamano*, 604 F. Supp.2d at 427 & n.6 (citing cases).

III.    **ANALYSIS**

    A.    **Whether New York or Ohio Law Governs this Diversity Action**

        After carefully considering the matter, Court finds that New York has the "greatest interest in [this] litigation." *Tischmann,* 882 F. Supp. at 1366 (citing *Hutner*, 734 F.2d at 899). This is because (1) Plaintiff is a New York corporation (Dkt. No. 1, Attach. 2 at 5), (2) the Policy contemplated construction work on water treatment plant facilities located in New York (Dkt. No. 25, Attach. 9 at 14; Dkt. No. 28, Attach. 19 at 120; Dkt. No. 36, Attach. 19 at 120), (3) the Policy includes relevant New York policy changes pursuant to New York law (*see generally* Dkt. No. 25, Attachs. 8-10; Dkt. No. 28, Attach. 19 at 2-180; Dkt. No. 36, Attach. 19 at 2-180), and (4) in their motion papers, the parties both cite predominately New York law (*see generally* Dkt. No. 25, Attach. 2; Dkt. No. 38; Dkt. No. 42; Dkt. No. 30; Dkt. No. 35; Dkt. No. 44). For these reasons, the Court finds that the law of the State of New York applies.

    B.    **Defendant's Motion for Summary Judgment–Floater Part Claims**

        As described above in Part I.C.1. of this Decision and Order, in support of its motion for summary judgment on Plaintiff's Floater Part claims, Defendant argues as follows: (1) Plaintiff's losses are not covered by the Floater Part's definition of "Covered Property"; (2) even if Plaintiff's losses are "Covered Property," three exclusions within the Floater Part apply, barring Plaintiff coverage. The Court addresses each argument below.

        At the outset, the Court notes that Plaintiff made two separate Floater Part claims for the two separate incidents at Sawmill Creek and Wetzel Road. Although the factual circumstances giving rise to each of the separate claims are different, the parties' motion papers acknowledge factual issues regarding each claim are identical. Specifically, the parties have briefed the Court on whether Plaintiff's claimed losses for each incident are covered by the Floater Part's

"Covered Property" provision, and if not, whether any exclusions apply barring Plaintiff from coverage.  As a result, the Court will address both the Sawmill Creek and Wetzel Road Floater Part claims together.

### 1.    Definition of "Covered Property"

The Floater Part states that Defendant "will pay for 'loss' to Covered Property from any of the Covered Causes of Loss."  (Dkt. No. 25, Attach. 10 at 145.)  The central dispute is whether Plaintiff's losses (specifically, the damage to Plaintiff's sheet piles used at both Sawmill Creek and Wetzel Road and the bracing used only at Wetzel Road) constitute "Covered Property."[11]  (Dkt. No. 25, Attach. 2 at 7-9; Dkt. No. 38 at 9-12; Dkt. No. 42 at 1-3.)

"Covered Property" is defined by the Floater Part as follows:

> 1.    **COVERED PROPERTY**, as used in this Coverage Form, means:
>    a.    Your materials, including labor, and supplies to be used in or incidental to the construction, erection, or installation of the property described in the Declarations;[12]

---

[11]    The Court acknowledges Plaintiff's argument that Defendant waived its right to assert this argument when Defendant failed to identify it as a reason for denying coverage in its December 3, 2008, letter.  (Dkt. No. 38 at 9-10 [citing *Estee Lauder Inc. v. OneBeacon Ins. Group, LLC*, 62 A.D.3d 33, 35 (N.Y. App. Div. 1st Dep't 2009)].)  However, the Court agrees with Defendant that, even if the argument is waived as a matter of law, such waiver does not create coverage where the alleged loss is not within the scope of the policy.  *See Albert J. Schiff Assoc., Inc. v. Flack*, 51 N.Y.2d 692, 698 (N.Y. 1980) (holding that the failure to disclaim coverage does not create coverage which the policy was not written to provide); *see also Zappone v. Home Ins. Co.*, 55 N.Y.2d 131, 134 (N.Y. 1982) (applying same principle to professional indemnity insurance policies).  As a result, assuming that Defendant waived its right to argue that Plaintiff is barred from coverage because the alleged loss is not "Covered Property" as defined by the Floater Part, Plaintiff would still be required to establish that its loss is, indeed, "Covered Property."  As discussed more completely below in this Part and Part III.D.1. of this Decision and Order, the Court finds that this remains a genuine dispute of material fact for a factfinder at trial.

[12]    The Court notes that the Floater Part Declarations page describes the property as follows: "[Defendant] cover[s] materials and supplies to be used in the construction, erection, or installation of **CONCRETE CONSTRUCTION & MATERIALS ASSOCIATED WITH WATER TREATMENT FACILITIES**[.]" (Dkt. No. 25, Attach 10 at 143 [emphasis in original].)

> **b.** Similar property of others that is in your care, custody or control.
>
> We will pay for "loss" to Covered Property from any of the Covered Causes of Loss, while:
>
> > **(1)** on the premises awaiting and during construction, erection or installation;
> > **(2)** awaiting tests and during testing;
> > **(3)** in transit.

(Dkt. No. 1, Attach. 4 at 48; Dkt. No. 25, Attach. 10 at 145; Dkt. No. 28, Attach. 20 at 6; Dkt. No. 36, Attach. 20 at 6.) Moreover, the Floater Part excludes coverage of the following property:

> **a.** Property while on any premises owned, leased, or controlled by you unless the property is designated for a specific construction project.
> **b.** *Contractor's* and subcontractor's *tools and equipment*;
> **c.** Accounts, bills, currency, deeds, evidences of debt, money, notes, securities, manuscripts, records or other documents;
> **d.** Motor vehicles, trailers or other conveyances or their equipment or accessories;
> **e.** Contraband, or property in the course of illegal transportation or trade.

(*Id.* [emphasis added.])

The Court finds that the parties have adduced definitions and evidence that raise a genuine dispute of material fact as to whether the damaged property (sheet piles and bracing) are (a) covered by the Floater Part because they are "materials . . . and supplies" or (b) excluded by the Floater Part because they are "tools and equipment." (*See generally* Dkt. No. 25, Attach. 2; Dkt. No. 38; Dkt. No. 42.)

Specifically, Defendant argues that because Plaintiff planned (before the sheet piles were damaged) to reuse the sheet piles at other job sites, and because similar objects (i.e., trench boxes and spreaders) were specifically listed by Plaintiff as equipment under a separate part of the Policy, sheet piles and bracing must be considered equipment. (Dkt. No. 25, Attach. 2, at 8; Dkt. No. 42, at 1-3; Dkt. No. 25, Attach. 12, at 252.) Defendant also argues that the "materials . . .

and supplies" constituting "Covered Property" are only those things that are incorporated into the structure.  (Dkt. No. 25, Attach. 2, at 6-9.)

In opposition, Plaintiff argues that the terms of the Floater Part are broad enough to encompass the sheet piles and bracing because they were "used in" (or, at least, were "incidental to") construction. (Dkt. No. 1, Attach. 4, at 48; Dkt. No. 38, at 9-12.)

The Court rejects Defendant's argument that sheeting piles are "tools and equipment" as a matter of law because Plaintiff intended to reuse them in future construction projects.  In support, Defendant provides only an Arizona Court of Appeals case that purportedly holds that anything that does not become a part of the finished structure is considered a "tool" or "equipment."  (Dkt. No. 25, Attach. 2 at 7-8 [citing *Hanson's, Inc. v. Great SW Fire Ins. Co.*, 118 Ariz. 256, 258 (Ariz. Ct. App. 1978)].)  Defendant fails to reconcile the fact that the sheeting piles in this case did, in fact, become a part of the structures.  (*Id.*)  Moreover, *Hanson's, Inc.*, does not stand for the proposition Defendant purports because the case does not discuss tools and equipment.  *See generally Hanson's, Inc.*, 118 Ariz. 256.  *Hanson's Inc.*, is also distinguishable on its facts because the language of the Installation Floater in that case more specifically indicated that only "machinery and equipment" to be installed was covered.  *Id.* at 258.

The Court also rejects Defendant's argument that the sheeting piles and bracing should be considered "tools and equipment" as a matter of law because those things are analogous to the "trench box" and "spreaders" that are listed on Plaintiff's equipment schedule of the Policy.  (*Id.* at 8; Dkt. No. 42 at 2-3.)  It appears that Plaintiff's list of equipment on the schedule is complete. (Dkt. No. 25, Attach. 12 at 248-80.)  The list contains over 100 items, and they are specifically described by name, serial number, and size where appropriate.  (*Id.*)  Therefore, it appears to the Court that Plaintiff did not, as Defendant argues, simply "neglect to include the sheet piles and [bracing] on the equipment schedule."  (Dkt. No. 42.)

The Court agrees with Plaintiff that, absent a definition that can be plainly determined from the Policy itself, the terms "materials," "supplies," "equipment," and "tools," are ambiguous.  (Dkt. No. 38 at 11-12.)  However, the Court declines to adopt Plaintiff's interpretation of the Floater Part's definition of "Covered Property" (i.e., that the sheeting piles and bracing are considered "materials . . . and supplies" rather than "tools and equipment") because that is precisely the kind of genuine dispute of material fact that is appropriate for resolution by a factfinder at trial.  For these reasons, Defendant's motion for summary judgment on the ground that Plaintiff's losses are not "Covered Property" is denied.

## 2.    Exclusions

In support of his motion for summary judgment, Defendant argues that even if Plaintiff's losses are covered by the Floater Part's definition of "Covered Property," Plaintiff is barred from coverage because the three exclusions described below in Parts III.B.2.a. through III.B.2.c. of this Decision and Order.

In New York, "[t]he phrase 'caused by or resulting from' in reference to an excluded peril requires that the insurer prove the excluded peril. . . is the proximate cause of the loss." *Home Ins. Co. v. Am. Ins. Co.*, 147 A.D.2d 353, 354 (N.Y. App. Div. 1st Dep't 1989).  However, "the concept of proximate cause when applied to insurance policies is a limited one.  Thus, . . . the causation inquiry stops at the efficient physical cause of the loss; it does not trace events back to their metaphysical beginnings." *Home Ins. Co.*, 147 A.D.2d at 354; *see also Goldstein v. Standard Acc. Ins. Co.*, 236 N.Y. 178, 183 (N.Y. 1923) (holding that a court is "to follow the chain of causation so far, and so far only, as the parties meant that [the court] should follow it"); *Album Realty Corp. v. Am. Home. Assurance Co.*, 80 N.Y.2d 1008, 1010 (N.Y. 1992).

As discussed more completely below in Parts III.B.2.a., III.B.2.b., and III.B.2.c. of this Decision and Order, the Court finds that whether Plaintiff's losses arising out of the incidents at

Sawmill Creek and Wetzel Road were proximately caused by the "collapse," "faulty

workmanship," and/or "delay" exclusions is a genuine dispute of material fact for a factfinder to

decide at trial.

      **a.**      **"Earth Movement" Exclusion**

The "earth movement" exclusion in the Floater Part reads as follows:

> **B.**     **EXCLUSIONS** . . .
>     **2.**     We will not pay for a 'loss' caused by or resulting from any
>           of the following: . . .
>           **f.**     Settling, shrinkage, expansion, subsidence or earth
>               movement below or adjoining foundations, footings
>               or structures. But if loss or damage by earthquake,
>               flood, landslide, snowslide, avalanche, or total or
>               partial collapse occurs, we will pay for that
>               resulting loss or damage.

(Dkt. No. 1, Attach. 4 at 49; Dkt. No. 25, Attach. 10 at 146; Dkt. No. 28, Attach. 20 at 7; Dkt.

No. 36, Attach. 20 at 7.)

      The Court holds that, based on the current record, there is no genuine dispute that, at both

Sawmill Creek and Wetzel Road, the earth moved within the meaning of the "earth movement"

exclusion of the Floater Part.  Specifically, Plaintiff's expert prepared a report that characterized

the incidents at each site as "ground loss," "ground movement," "shifting of the ground,"

"boiling in the excavation bottom," and "settlement."  (Dkt. No. 25, Attach. 6 at 22, 23, 29.)

Moreover, the Court is not persuaded by Plaintiff's argument that there is a meaningful

distinction between what occurred "outside and surrounding the sheeting pit" (where Plaintiff

admits that "the soil . . . had settled") and what occurred "within the sheeting pit" (where "the

soils . . . burped, boiled or shifted, [but] did not settle.")  (Dkt. No. 37 at 8.)  For these reasons,

the Court finds that there is no genuine dispute as to whether the incidents at either Sawmill

Creek or Wetzel Road resulted in the "earth movement" contemplated by the Floater Part: they

did.

However, the Court finds that there is a genuine dispute as to whether Plaintiff is barred from coverage by the "earth movement" exclusion because of the "total or partial collapse" exception.  (Dkt. No. 1, Attach. 4 at 49; Dkt. No. 25, Attach. 10 at 146; Dkt. No. 28, Attach. 20 at 7; Dkt. No. 36, Attach. 20 at 7.)  Both parties agree that "determining whether a collapse has occurred rests largely on the degree of damage" and that "substantial impairment of the structural integrity of a building is said to be a collapse."  (Dkt. No. 38 at 12; Dkt. No. 35 at 8 [citing *Royal Indemnity Co. v. Grunberg*, 155 A.D.2d 187, 189 (N.Y. App. Div. 3d Dep't 1990)].)[13]  The parties dispute, however, whether either the damage to the sheeting piles at Sawmill Creek and Wetzel Road, or the settlement of the old pump station at Sawmill Creek, constitute "substantial impairment of . . . structural integrity."  (*Id.*)  Although both parties cite case law to support their respective positions on whether Plaintiff's losses were caused by collapse, the Court finds that none of the cases are dispositive under the circumstances.[14]

---

[13]     This is apparently notwithstanding the Second Circuit's findings in *Dalton v. Harleysville Worcester Mut. Ins. Co.*, 557 F.3d 88 (2d Cir. 2009).  In that case, the Second Circuit found that:

> The state of the law in New York with respect to the meaning of the term 'collapse' . . . is a conflict of Appellate Division rulings as to whether 'substantial impairment of the structural integrity of the building' suffices to come within the term, as the Third Department held in *Grunberg*, or whether 'total or near total destruction' is required, as held in *Graffeo* [*v. U.S. Fid. & Guar. Co.*, 20 A.D.2d 643, 644 (N.Y. App. Div. 2d Dep't 1964)].

*Dalton*, 557 F.3d at 92.  In any event, because the parties are in agreement, and the state of the law in New York remains unsettled, the Court will use the parties' characterization of "collapse" pursuant to *Grunberg*, 155 A.D.2d at 189.

[14]     *See Grunberg*, 155 A.D.2d at 188, 191 (holding that, where the defendants' [homeowners] house and deck "tilted seven inches out of plumb," it would be unreasonable to require that they wait until their house "was actually demolished or reduced to rubble" in order to receive coverage under their policy); *Rector St. Food Enters., Ltd. v. Fire & Cas. Ins. Co. of Conn.*, 35 A.D.3d 177, 177-78 (N.Y. App. Div. 1st Dep't 2006) (holding that the plaintiff was not entitled to coverage where the policy defined "collapse" as "an abrupt falling down or caving in"); *Chiang v. Pub. Serv. Mut. Ins. Co.*, 08-CV-7888, 2008 WL 5137081, at *1-2 (N.Y. Sup. Ct.

Moreover, the pertinent case law suggests that this determination is fact-specific, which is

precisely the type of inquiry for a factfinder at trial.  *See generally Dalton*, 557 F.3d 88; *Chiang*,

2008 WL 5137081; *Rector St. Food Enters., Ltd.*, 35 A.D.3d 177; *Grunberg*, 155 A.D.2d 187.

For these reasons, Defendant's motion for summary judgment on the basis that the "earth

movement" exclusion applies is denied.

### b.    "Faulty Workmanship" Exclusion

The "faulty workmanship" exclusion in the Floater Part reads as follows:

> **2.**    [Defendant] will not pay for a 'loss' caused by or resulting from any of the following:
> **a.**    Faulty, inadequate, defective, error or omission, or insufficiency in:
> **(i)**    Design, specifications, workmanship, repair, construction, remodeling, grading, compaction; or
> **(ii)**    Materials used in construction, erection or installation. . . .
> **3.**    [Defendant] will not pay for a 'loss' caused by or resulting from any of the following. But if 'loss' by a Covered Cause of Loss results, we will pay for that resulting 'loss.' . . .
> **c.**    Faulty, inadequate or defective:
> **(1)**    Planning, zoning, development, surveying, siting;
> **(2)**    Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
> **(3)**    Materials used in repair, construction, renovation or remodeling;
> **(4)**    Maintenance; of part or all of any property wherever located.

(Dkt. No. 1, Attach. 4 at 49; Dkt. No. 25, Attach. 10 at 146; Dkt. No. 28, Attach. 20 at 7; Dkt.

No. 36, Attach. 20 at 7.)

Defendant argues that, because it is undisputed that Plaintiff either received or obtained

inaccurate and insufficient soil and groundwater information regarding the Sawmill Creek and

---

Queens Cnty.2008) (holding that the plaintiff was not entitled to coverage under the policy's "collapse" provision, which specifically excluded "settling, cracking, shrinkage, bulging or expansion", where the building experienced "cracking of the foundation and several interior walls and ceilings of the building").

Wetzel Road sites, it follows that Plaintiff's design, workmanship, planning, development, surveying, siting and construction were "faulty, inadequate or defective." (Dkt. No. 25, Attach. 2 at 10-12.) In opposition, Plaintiff argues that, for purposes an exclusionary clause analysis, the Court should determine the most direct cause of the loss, rather than "trace [the cause of] the events back to their metaphysical beginnings." (Dkt. No. 38 at 13-14 [citing *Album Realty Corp.*, 80 N.Y.2d at 1011; *Kimmins Indus. Serv. Corp. v. Reliance Ins. Co.*, 19 F.3d 78, 81 (2d Cir. 1994)].) Therefore, Plaintiff argues that the most direct causes of loss were Plaintiff's "driving of the sheet piles" into the ground at Sawmill Creek, and striking the aquifer at Wetzel Road with H-piles. (Dkt. No. 38 at 14.)

Here, the Court finds that there is a genuine dispute of material fact as to whether the proximate cause of the losses was, as Defendant argues, the soil and groundwater misinformation at Sawmill Creek and Wetzel Road, or whether it was, as Plaintiff argues, driving the sheet piles and H-piles into the ground at each site. There is record evidence to support a conclusion that the soil and groundwater misinformation was the proximate cause of the incidents. (Dkt. No. 25, Attach. 6 at 25 [Plf.'s expert explaining that the soil misinformation at Wetzel Road "directly impacted the success of . . . construction operations"].) This finding would support Defendant's argument that, because the cause of Plaintiff's losses were the result of faulty or inadequate planning, development, surveying, siting, design, specifications, workmanship or construction, Plaintiff is barred from coverage under the Policy. (Dkt. No. 25, Attach. 2 at 10-12.)

There is also record evidence, however, to support a conclusion that the "physical cause of the loss" was driving the sheet piles into the ground at Sawmill Creek and driving the H-piles into the aquifer at Wetzel Road. (Dkt. No. 25, Attach. 5 at 31 [OBG engineer testifying (about Sawmill Creek) that the Plf.'s installation of the sheet piles applied an excess of energy resulting

in the soil liquefying and settling]; Dkt. No. 25, Attach. 6 at 31 [Plf.'s expert explaining (about

Sawmill Creek) that "[i]nstallation of the sheet piling induced excess pore pressures in the

underlying soils under the dynamic loading of vibratory driving causing the soils to liquefy and

lose strength with consequent shifting of the ground and sheet piling"]; Dkt. No. 25, Attach. 6 at

25 [Plf.'s expert explaining (about Wetzel Road) that "[d]riving of the [H-]piles punctured a

deeper groundwater aquifer undisclosed by the available soils information and led to the upward

flow of groundwater. . ."].)  This finding would support Plaintiff's argument that, because the

"efficient proximate cause of [its] . . . losses" was not excluded by the Policy, Plaintiff's losses

are covered.  (Dkt. No. 38 at 13-15.)

     Moreover, even assuming that the proximate cause of the incidents was soil and

groundwater misinformation (and thus  "faulty workmanship"), in New York, the faulty

activities that caused the losses must have been carried out by the insured—not a third-party.

*See 242-44 East 77th Street LLC v. Greater New York Mut. Ins. Co.*, 815 N.Y.S.2d 507, 512

(N.Y. App. Div. 1st Dep't 2006) ("To apply the negligent work exclusion to negligent work

performed by persons other than the insured . . . would require a strained and irrational

interpretation of the exclusion.").

     Here, the record demonstrates that there is a genuine dispute of material fact as to

whether Plaintiff or the County is at fault for the soil and groundwater misinformation.  (Dkt.

No. 25, Attach. 7 at 10 [Ltr. from Plf.'s expert stating, "In summary, these more adverse soil

conditions disclosed during construction were clearly not indicated in the information made

available to [Plf.] and directly impacted planned construction operations with consequent

impacts. . . ."]; Dkt. No. 25, Attach. 7 at 21 [Plf.'s ltr. to OBG setting forth its "position that

delays associated with this differing site condition are the responsibility of the [County]. . . ."];

Dkt. No. 25, Attach. 7 at 24 [OBG's letter to Plf. emphasizing that Plf. had adequate opportunity to examine and analyze the subsurface site conditions].)  Simply stated, even if the Court was to accept Defendant's argument that the proximate cause of Plaintiff's losses was faulty workmanship, the Court would not find that the exclusion bars Plaintiff's recovery, because it is unclear whether Plaintiff or a third-party (the County) is at fault for the soil and groundwater misinformation.  For these reasons, Defendant's motion for summary judgment on the ground that the "faulty workmanship" exclusion applies is denied.

### c.    "Delay" Exclusion

The "delay" exclusion in the Floater Part reads as follows:

> **2.**    We will not pay for a 'loss' caused by or resulting from any of the following: . . .
> **b.**    Delay, or loss of market.

(Dkt. No. 1, Attach. 4 at 49; Dkt. No. 25, Attach. 10 at 146; Dkt. No. 28, Attach. 20 at 7; Dkt. No. 36, Attach. 20 at 7.)

Defendant's argument as it relates to this exclusion actually consists of separate arguments.  First, Defendant argues that some of Plaintiffs "claimed expenses" (specifically, engineering costs to redesign the projects, costs for monitoring the sites, and all of Plaintiff's "extended general conditions") are not covered by the Floater Part because they arose from delays in construction.  (Dkt. No. 25, Attach. 2 at 13.)  Second, Defendant argues that Plaintiff's "extended general conditions" are not a "'loss' to Covered Property."  (*Id.* at 14.)

In support of its first argument, Defendant only conclusorily argues that the "claimed sums" described above are not covered because the Floater Part does not provide coverage for "'loss' caused by or resulting from . . . [d]elay, or loss of market." (*Id.* at 13.)  Defendant does not provide any admissible record evidence establishing that the expenses arose from delays in

24

construction.  (*See generally* Dkt. No. 25, Attach. 2 at 13-14.)  Moreover, in opposition, Plaintiff

argues, and adduces admissible record evidence establishing, that it timely completed the

projects.  (Dkt. No. 38 at 21.)  Therefore, the Court finds there is a genuine dispute of material

fact as to whether Plaintiff's claimed expenses arose from delays in construction, or whether

they arose from, as Plaintiff argues, increased work effort.  (Dkt. No. 38 at 20.)[15]

In support of its second argument, Defendant essentially argues that any claimed

expenses beyond the physical repair of the sheet piles and bracing do not constitute "covered

property" because they are not "materials" or "supplies."  (*See generally* Dkt. No. 25, Attach. at

14.)  For the reasons stated in above in Part III.B.1. and below in Part III.D.1. of this Decision

and Order, the Court finds that there is a genuine dispute of material fact as to what constitutes

"Covered Property" under the Floater Part.

For these reasons, the Court denies Defendant's motion for summary judgment as to

whether the "delay" exclusion applies.

### C.    Defendant's Motion for Summary Judgment–CGL Claims

As described above in Part I.C.1. of this Decision and Order, in support of its motion for

summary judgment on Plaintiff's CGL claims, Defendant argues as follows: (1) Defendant is not

obligated to indemnify Plaintiff for the costs it incurred for jet grouting at Sawmill Creek

because Plaintiff was under no legal obligation to incur those costs; (2) Plaintiff's losses are

purely economic, which are not covered by the CGL; (3) even if Defendant is obligated to

---

[15]    The Court acknowledges that, in opposition to this argument, Plaintiff argues that
Defendant waived its right to disclaim coverage on this basis because it did not set forth this
defense in its December 3, 2008, letter.  (Dkt. No. 38 at 20.)  However, for reasons similar to
those set forth above in footnote 13 of Part III.B.1. of this Decision and Order, the Court finds
that, even if Defendant did waive this argument, Plaintiff would still be required to prove that
coverage is within the scope of the policy.  *See e.g., Albert J. Schiff Assoc., Inc.*, 51 N.Y.2d at
698.  As discussed above, a genuine dispute of material fact remains as to which of Plaintiff's
losses constitute "Covered Property" under the Floater Part.

indemnify Plaintiff under the CGL, two exclusions ("business risk" and "professional liability") apply barring Plaintiff's coverage; and (4) the CGL's "voluntary payment" provision bars Plaintiff's coverage. The Court addresses each argument below.

### 1.    Legal Obligation to Pay

Under the CGL, Defendant is obligated to pay Plaintiff for "those sums that [Plaintiff] becomes legally obligated to pay as damages because of . . . 'property damage' to which [the Policy] applies." (Dkt. No. 25, Attach. 8 at 110; Dkt. No. 28, Attach. 19 at 106; Dkt. No. 36, Attach. 19 at 106.)  The phrase "legally obligated" is not defined by the CGL.  (*Id.*)  Defendant argues that, because the County never asserted a legal claim against Plaintiff for the damage to the old pump station at Sawmill Creek, Plaintiff was not legally obligated to pay for any of its remedial work, and therefore Defendant is not obligated under the CGL to cover those costs. (Dkt. No. 25, Attach. 2 at 16-17.)  Plaintiff argues that the County did, in fact, assert a "claim" against Plaintiff for the property damage to the old pump station at Sawmill Creek, as New York courts have defined that term.  (Dkt. No. 38 at 23-25.)

"New York law . . . follow[s] the general rule that liability of the insurer attaches when there is a final judgment against the insured as a result of an obligation imposed by law." *M & M Elec., Inc. v. Com. Union Ins. Co.*, 241 A.D.2d 58, 60 (N.Y. App. Div. 2d Dep't 1998), *accord*, *Westchester Fire Ins. Co. v. Utica First Ins. Co.*, 40 A.D.3d 978, 980 (N.Y. App. Div. 2d Dep't 2007).[16]  In addition, "[t]o hold that an insurer's duty to pay under the terms of a liability policy may arise even where no legal claim has been asserted against the insured, would be to

---

[16]        *See also State Farm Mut. Auto. Ins. Co. v. Westlake*, 35 N.Y.2d 587, 591 (N.Y. 1974); *Podolsky v. Devinney*, 281 F. Supp. 488, 494 (S.D.N.Y. 1968) ("Nor can the obligation to indemnify arise until a judgment has been entered against the insured."); 7A Couch on Insurance § 103:14 (collecting cases) ("The term 'legal liability,' as used in a policy of insurance, means a liability such as a court of competent jurisdiction will recognize and enforce between parties litigant.").

nullify the important right that the liability insurer has to control the litigation which is contemplated . . . ." *M & M Elec., Inc.*, 241 A.D.2d at 62.[17]

Here, it is undisputed that the County never obtained a "final judgment" against Plaintiff for the damage incurred to the old pump station at Sawmill Creek; rather, the County and Plaintiff merely exchanged letters setting forth their opinions that the other was responsible for the cost of repairs. (Dkt. No. 25, Attach. 7 at 21-22 [Ltr. dated Mar. 30, 2006, from Plf. to OBG stating that "it is [Plf.'s] position that delays associated with this differing site condition are the responsibility of the [County] along with any other resulting damages and/or impacts."]; Dkt. No. 25, Attach.7 at 24-25 [Ltr. dated Apr. 20, 2006, from OBG to Plf. stating that "[a]ny costs of delays associated with [remedying the damage at the old pump station at Sawmill Creek] rest with [Plf.]."]; Dkt. No. 25, Attach. 7 at 27-29 [Ltr. dated May 25, 2006, from OBG to Plf. explaining that OBG had, "for the last time" examined "the circumstances at [Sawmill Creek]" and determined that "[Plf.] will not receive any additional compensation for the self-inflicted impacts at [Sawmill Creek]") These letters are insufficient to rise to the level of a "final judgment," under the circumstances. *M & M Elec., Inc.*, 241 A.D.2d at 60; *Westchester Fire Ins. Co.*, 40 A.D.3d at 980; *State Farm Mut. Auto. Ins. Co.*, 35 N.Y.2d at 591; *Podolsky*, 281 F. Supp. at 494.

Moreover, it is undisputed that the CGL created Defendant's "right and duty to defend [Plaintiff] against any 'suit' seeking . . . damages." (Dkt. No. 25, Attach. 10 at 92; Dkt. No. 28, Attach. 10 at 106; Dkt. No. 36, Attach. 19 at 106.) However, Defendant was precluded from exercising its right to defend against the County's claim, because Plaintiff elected to absorb the

---

[17]     *See also Ottaviano v. Genex Co-op., Inc.*, 15 A.D.3d 924, 924 (N.Y. App. Div. 4th Dep't 2005) ("As a general rule, a liability insurer has a right to control the defense of underlying litigation against its insured based on the right of the insurer to protect its financial interests.").

costs of the damage at the old pump station at Sawmill Creek before Defendant had an

opportunity to investigate, defend against, and/or settle the claim.  To hold that Defendant is

obligated to indemnify Plaintiff for the costs it incurred to remedy the damage at the old pump

station at Sawmill Creek would "nullify [Defendant's] right . . . to control the litigation . . .

contemplated."  *M & M Elec., Inc.*, 241 A.D.2d at 62; *see also Ottaviano*, 15 A.D.3d at 924.

For these reasons, the Court grants Defendant's motion for summary judgment on

Plaintiff's CGL claims.

## 2.    Defendant's Other Arguments

Because the Court finds that Defendant is not obligated by the CGL to indemnify

Plaintiff for the costs related to the damage at the old pump station at Sawmill Creek,

Defendant's remaining arguments regarding Plaintiff's CGL claims are moot.  However, in the

interest of thoroughness, the Court briefly addresses them below.

First, the Court finds that Defendant's argument that Plaintif's "claimed expenses"

(specifically, project delay costs, additional engineering costs, labor and materials) are "purely

economic loss" and did not arise from property damage is without merit for two reasons.  (Dkt.

No. 25, Attach. 2 at 17-18.)  As an initial matter, the Court finds that it has not been established

that Plaintiff's work was defective or faulty, as discussed in Part III.B.2.b. of this Decision and

Order.  That fact alone makes the cases to which Defendant cites distinguishable.  *See Hartford*

*Acc. & Indem. Co. v. Reale Sons*, 228 A.D.2d 935, 936 (N.Y. App. Div. 3d Dep't 1996) (holding

that the insured was not entitled to coverage under the policy where it sought indemnification

"for the repair and/or replacement costs of a sewage treatment plant [it] installed in an improper

and incompetent manner." [internal citations omitted.]); *George A. Fuller Co. v. U.S. Fid. &*

*Guar. Co.*, 200 A.D.2d 255, 259-60 (N.Y. App. Div. 1st Dep't 1994) (denying the insured

coverage where it was clear that the insurance claims arose out of the insured's improper "installation of the flooring, curtain wall and windows and metering system").

Moreover, the Court finds that there is no genuine dispute of material fact as to whether Plaintiff incurred its "claimed expenses" due to "property damage" to the old pump station at Sawmill Creek. (Dkt. No. 38 at 26-27.) "Property damage" is defined by the CGL as "[p]hysical injury to tangible property, including all resulting loss of use of that property." (Dkt. No. 25, Attach. 8 at 102; Dkt. No. 28, Attach. 19 at 98; Dkt. No. 36, Attach. 19 at 98.) In its Statement of Material Facts, Defendant acknowledges that "portions of the pump station and associated structures had settled by 3 to 8 inches" and that "[i]n order to stabilize the structures . . . [Plaintiff] and the County agreed that jet grout columns should be installed to underpin the old pump station. . . ." (Dkt. No. 25, Attach. 3 at 4-5.) The Court is unpersuaded by Defendant's argument that the old pump station did not experience "property damage," because, according to Defendant's own description, it "settled by 3 to 8 inches." (*Id.*)

Second, the Court agrees with Defendant's argument that, even if it is obligated under the CGL, the "business risk" exclusion[18] applies, barring Plaintiff's coverage to the extent that it

---

[18]    In pertinent part, this exclusion reads as follows:

> **2.    Exclusions**
> This insurance does not apply to: . . .
> **j.    Damage to Property**
> 'Property damage' to: . . .
> **(5)**    That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
> **(6)**    That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

(Dkt. No. 25, Attach. 8 at 88; Dkt. No. 28, Attach. 19 at 84; Dkt. No. 36, Attach. 19 at 84.)

relates to Section I.2.j.5 of the CGL, for the reasons set forth in Defendant's memorandum of law.  (Dkt. No. 25, Attach. 2 at 18-21.)  However, the Court finds that Defendant's argument that Section I.2.j.6. of the CGL bars Plaintiff's coverage is without merit, because it has not been established that Plaintiff's work "was incorrectly performed" as discussed in Part III.B.2.b. of this Decision and Order.

Third, the Court rejects Defendant's argument that the "professional liability" exclusion[19] applies because, as discussed above in Part III.B.2.b. of this Decision and Order, there is a genuine dispute of material fact as to whether Plaintiff or the County was responsible for the type of "professional services" the exclusion contemplates.  Specifically, there remains a genuine dispute of material fact as to whether Plaintiff or the County was responsible for obtaining accurate soil and groundwater information.

---

[19]     In pertinent part, this exclusion reads as follows:

**1.**     This insurance does not apply to . . . 'property damage' . . . arising out of the rendering or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:
  **a.**     Providing engineering, architectural or surveying services to others; and
  **b.**     Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.
**2.**     Subject to paragraph **3.**, below, professional services include:
  **a.**     Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and
  **b.**     Supervisory or inspection activities performed as part of any related architectural or engineering activities.
**3.**     Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with construction work you perform.

(Dkt. No. 25, Attach. 9 at 30; Dkt. No. 28, Attach. 19 at 136; Dkt. No. 36, Attach. 19 at 136.)

Fourth, the Court rejects Defendant's argument that the "voluntary payment" provision[20] bars Plaintiff from coverage under the CGL, because there is a genuine dispute of material fact as to when Plaintiff agreed, under protest, to remedy the damage to the old pump station at Sawmill Creek.  Specifically, at his deposition on September 12, 2008, Daniel Falter testified that he could not recall whether, as Defendant argues, Plaintiff agreed to fund the jet grouting at Sawmill Creek on June 21, 2005.  (Dkt. No. 28, Attach. 2 at 26-27.)  In its Response Statement of Material Facts, Plaintiff reiterates that the decision was made "well after" June 22, 2005 (the date Plaintiff gave notice of the incident to Defendant).  (Dkt. No. 38 at 31.)  However, at his deposition on July 8, 2010, Daniel Falter testified that Plaintiff did, as Defendant argues, agree to fund the jet grouting at Sawmill Creek on June 21, 2005.  (Dkt. No. 25, Attach. 5 at 129-30.) Moreover, Plaintiff's engineers wrote Plaintiff a letter dated July 7, 2005, indicating that, pursuant a meeting held on June 21, 2005, they "prepared a preliminary plan and design for stabilizing the existing Sawmill Pump Station by Jet Grouting."  (Dkt. No. 25, Attach. 6 at 62.) For these reasons, the Court finds that a genuine dispute of fact remains as to whether Plaintiff is barred from coverage by the "voluntary payment" provision of the CGL.

---

[20]    In pertinent part, this provision reads as follows:

    **2.**    **Duties In The Event of Occurrence, Offense, Claim or Suit** . . .
        **d.**     No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [Defendant's] consent.

(Dkt. No. 25, Attach. 8 at 96; Dkt. No. 28, Attach. 19 at 92; Dkt. No. 36, Attach. 19 at 92.)

**D.     Plaintiff's Motion for Partial Summary Judgment–Floater Part Claims**

As described above in Part I.C.2. of this Decision and Order, Plaintiff argues that it is entitled to summary judgment on several of Defendant's affirmative defenses for the following reasons: (1) Plaintiff's losses constitute "Covered Property"; (2) the damage at Sawmill Creek and Wetzel Road was caused by "collapse"; (3) the "faulty workmanship" exclusion does not applies only to finished products; and (4) even if the "faulty workmanship" exclusion precludes Plaintiff from coverage, the "collapse" exception applies restoring coverage.  The Court addresses each argument below.

**1.     Whether Plaintiff's Losses Are "Covered Property"**

Plaintiff argues that its losses are recoverable under the Floater Part because they include costs associated with the "labor" needed to repair the sheet piles at Sawmill Creek and the damaged bracing at Wetzel Road.  (Dkt. No. 30 at 15-17.)  Because the term "labor" is included in the Floater Part's definition of "Covered Property," Plaintiff argues that all costs unrelated to the physical repair of the sheet piles and bracing should be covered because they represent labor costs necessary to remedy the damage that occurred at Sawmill Creek and Wetzel Road.  (*Id.*)

Part III.B.1. of this Decision and Order sets forth the definition of "Covered Property" under the Floater Part.  The Court rejects Plaintiff's argument that it is entitled recover all costs associated with the additional, unforeseen construction needed following the incidents at Sawmill Creek and Wetzel Road.  Specifically, as Defendant argues in its memorandum of law, it would be inappropriate at this stage of litigation for the Court to determine that Plaintiff is entitled to recover because Plaintiff has failed to provide sufficient admissible record evidence establishing each of those alleged losses.  Indeed, Plaintiff has not provided the Court with a detailed listing of each alleged loss, how each constitute "Covered Property", and any evidence

in support of its arguments.  Therefore, the Court finds that, for these reasons and those stated above in Part III.B.1. of this Decision and Order, there remains a genuine dispute of material fact as to whether Plaintiff's losses are "Covered Property."  As a result, Plaintiff's motion for partial summary judgment on the ground that its losses are "Covered Property" is denied.

### 2.    Whether the "Collapse" Exception Applies

Plaintiff argues that, even if the "earth movement" exclusion of the Floater Part applies otherwise barring it from coverage, the "collapse" exception to the exclusion restores Defendant's obligation to cover Plaintiff's costs.  (Dkt. No. 30 at 17-18.)  For the reasons stated above in Part III.B.2.a. of this Decision and Order, the Court finds there is a genuine dispute of material fact as to whether the property damage at Sawmill Creek and Wetzel Road was caused by collapse.  As a result, the Court denies Plaintiff's motion for partial summary judgment on the issue of Defendant's "earth movement" affirmative defense.

### 3.    Whether the "Faulty Workmanship" Exclusion Applies

Plaintiff argues that the "faulty workmanship" exclusion does not preclude Plaintiff from coverage under the Floater Part.  (Dkt. No. 30 at 18-21.)  Specifically, Plaintiff argues that (1) the exclusion only applies to finished products, and (2) even if the exclusion does apply, the "collapse" exception restores coverage.  (*Id.*)

The Court rejects Plaintiffs first argument for the reasons stated in Defendant's memorandum of law in opposition to Plaintiff's motion for partial summary judgment.  (Dkt. No. 35 at 11-13.)  Specifically, the Court is persuaded that the Floater Part provides coverage for materials and supplies used only before and during the construction process.  (*Id.* at 35.)

In addition, the Court rejects Plaintiff's second argument that the "collapse" exception restores Defendant's obligation to cover Plaintiff's losses because, as discussed more completely

above in Part III.B.2.a. of this Decision and Order, there is a genuine dispute of material fact as to whether the damage at Sawmill Creek and Wetzel Road was caused by collapse. As a result, the Court denies Plaintiff's motion for partial summary judgment on the issue of Defendant's "faulty workmanship" affirmative defense.

**E.    Plaintiff's Motion for Partial Summary Judgment–CGL Claims**

As described in Part I.C.2. of this Decision and Order, Plaintiff argues that it is entitled to summary judgment on several of Defendant's affirmative defenses for the following reasons: (1) Plaintiff was legally obligated to pay for jet grouting at Sawmill Creek; (2) Plaintiff incurred its claimed losses because of "property damage" to the old pump station at Sawmill Creek; and (3) the unintended settlement of the old pump station at Sawmill Creek constitutes an "Occurrence" under the CGL.

**1.    Whether Plaintiff Had a Legal Obligation to Pay for Jet Grouting**

Plaintiff argues that because the CGL contains a provision stating that "[t]he Limits of Insurance shown in the Declarations and the rules below fix the most [Defendant] will pay regardless of the number of: . . . b. *Claims* made or 'suits brought . . .'" (Dkt. No. 25, Attach. 8 at 110; Dkt. No. 28, Attach. 19 at 106; Dkt. No. 36, Attach. 19 at 106), the relevant inquiry as to whether Plaintiff was legally obligated to pay for the repairs to the old pump station at Sawmill Creek (namely, jet grouting) is what constitutes a "claim." (Dkt. No. 30 at 22.) Plaintiff argues that a "claim" under New York law is defined broadly to mean "an assertion by a third party that . . . the [insured] may be liable to it for damages within the risks covered by the policy." (*Id.* at 23 [citing *Am. Ins. Co. v. Fairchild Indus., Inc.*, 56 F.3d 435, 439 (2d Cir. 1995)].) Plaintiff concludes by arguing that "there can be no doubt that the County made a 'claim' against

[Plaintiff] as the County repeatedly asserted that . . . [Plaintiff] was liable for the property damage it caused to the existing Sawmill Pump Station."  (Dkt. No. 30 at 23.)

The Court rejects Plaintiff's analysis because, as discussed above in Part III.C.1. of this Decision and Order, "New York law . . . follow[s] the general rule that liability of the insurer attaches when there is a final judgment against the insured as a result of an obligation imposed by law." *M & M Elec., Inc.*, 241 A.D.2d at 60, *accord*, *Westchester Fire Ins. Co.*, 40 A.D.3d at 980; *see also State Farm Mut. Auto. Ins. Co.*, 35 N.Y.2d at 591; *Podolsky*, 281 F. Supp. at 494; 7A Couch on Insurance § 103:14 (collecting cases).  The case law cited by Plaintiff is distinguishable because it addresses the meaning of the word "claim" in the context of whether an insured promptly and/or properly gave its insurer a "notice of claim" as required under the relevant insurance policies–not whether the insured was "legally obligated" under the policies. *See generally New York v. Ludlow's Sanitary Landfill, Inc.*, 50 F.Supp. 135, 138 (N.D.N.Y. 1999) (McAvoy, J.); *Am. Ins. Co.*, 56 F.3d at 439.

For these reasons, the Court finds that Plaintiff was not legally obligated to incur the costs associated with jet grouting, and therefore, Defendant is not obligated to indemnify Plaintiff for those costs.  As a result, Plaintiff's motion for partial summary judgment on this issue is denied.

## 2.    Whether Plaintiff's Losses Arose from "Property Damage"

Plaintiff argues that it should be indemnified for jet-grouting costs incurred at Sawmill Creek because those costs arose as a result of "property damage" as defined by the CGL.  (Dkt. No. 30 at 25-27.)  This argument is moot because the Court finds that Plaintiff is precluded from indemnification for these costs, as discussed more completely above in Part III.E.1. of this Decision and Order.

35

> 3.     Whether the Incident at Sawmill Creek Constitutes an "Occurrence"

Plaintiff argues that the "unintended . . . settlement" of the old pump station at Sawmill Creek constitutes an "occurrence" under the CGL because that term is defined, in part, as "an accident." (Dkt. No. 30 at 26-27.) This argument is moot because the Court finds that Plaintiff is precluded from indemnification for the costs associated with remedying the damage to the old pump station at Sawmill Creek, as discussed more completely above in Part III.E.1. of this Decision and Order.

> F.     Plaintiff's Motion for Partial Summary Judgment–Late Notice

As described above in Part I.C.2. of this Decision and Order, Plaintiff argues that Defendant either explicitly or implicitly waived its right to deny Plaintiff's Floater Part claim for the incident at Sawmill Creek based on late notice. (Dkt. No. 30 at 27-28.) As a result, Plaintiff argues, Defendant is precluded from asserting its Fifth Affirmative Defense set forth in Defendant's Answer. (*Id.*) The Court agrees with Plaintiff for the reasons set forth in its memorandum of law. (*Id.*)

The Court would add only two points. First, the Second Circuit has held that an insurer may irrevocably waive a defense where "the words and acts of the insurer reasonably justify the conclusion that with full knowledge of all the facts it intended to abandon or not insist upon the particular defense afterward relied upon." *State of New York v. AMRC Realty Corp.*, 936 F.2d 1420, 1431 (2d Cir. 1991) (internal quotation marks omitted). In addition, the New York Court of Appeals has recognized that an insurer may waive an available defense by failing to incorporate the defense into its letter disclaiming coverage. *Gen. Acc. Ins. Group v. Cirucci*, 46 N.Y.2d 862, 864 (N.Y. 1979) ("Although, under the facts of this case a disclaimer might have

been premised on the late notice furnished by the third parties themselves to the insurer, since this ground was not raised in the letter of the disclaimer, it may not be asserted now.").

Second, the admissible record evidence establishes that Defendant issued its letter disclaiming coverage on December 3, 2008, with "full knowledge of all the facts." *AMRC Realty Corp.*, 936 F.2d at 1431. Specifically, it is undisputed that Plaintiff had contacted its insurance agent, Mr. Anderson, on June 22, 2005, to report, at least, a CGL claim for the Sawmill Creek incident. (Dkt. No. 29 at 9 [Plf.'s Statement of Material Facts]; Dkt. No. 35, Attach. 1 at 12 [Def.'s Statement of Material Facts].) Subsequently, Defendant's claims adjuster sent Plaintiff an email message on October 2, 2007, waiving Defendant's "late notice" defense (Dkt. No. 36, Attach. 35 at 2) based on the representation (made by Plaintiff's insurance agent) that on June 22, 2005, "there was a [Floater Part claim] to be considered as well . . . but [f]or some reason, it was never set up" (Dkt. No. 36, Attach. 37 at 4). Although Defendant argues that this representation was false, Defendant fails to cite to any record evidence to support its argument. (*See generally* Dkt. No. 35, Attach. 1 at 15, 22-23.) Mr. Anderson's (the insurance agent who apparently neglected to set up the Floater Part claim after he received notice on June 22, 2005) testimony that he did not have any "conversation with anyone at . . . Falter with respect to this loss[] prior to April 5, 2007" is not persuasive because this excerpt (provided by Defendant) of Mr. Anderson's deposition gives no indication that he is referring to the property loss at Sawmill Creek giving rise to Plaintiff's Floater Part Claim. (Dkt. No. 35, Attach. 3 at 36.) For these reasons, the Court finds there is no genuine dispute of material fact as to whether Defendant waived its right to disclaim coverage based on late notice: it did. As a result, Plaintiff's motion for partial summary judgment on this issue is granted; and therefore, Defendant is precluded from asserting its Fifth Affirmative Defense set forth in its Answer (Dkt. No. 7).

37

G.    **Plaintiff's Motion for Partial Summary Judgment–Defendant's Late Disclaimer of Coverage**

As described in Part I.C.2. of this Decision and order, Plaintiff argues that, because Defendant did not issue its disclaimer of coverage until December 3, 2008, over two-and-a-half-years after Plaintiff provided Defendant with notice of its first claim, Defendant waived its right to deny coverage based on applicable exclusions or alleged violations of policy conditions.  (Dkt. No. 30 at 29-30.)  In support of this argument, Plaintiff cites case law that applies this principle to facts that address death or bodily injury, thereby implicating New York Insurance Law ("Insurance Law") § 1340(d).  (*Id.*)  Insurance Law § 1340(d) instructs that the insurer "shall give written notice as soon as is reasonably possible of such disclaimer of liability or denial of coverage to the insured. . . ."  N.Y. Insurance Law § 1340(d).  However, that statute applies only to claims based on "death or bodily injury"–neither of which are present in Plaintiff's case. *Id.* For this reason, the Court finds that the cases upon which Plaintiff relies are inapplicable.

Under New York common law, an insurer is estopped from asserting noncoverage "only where prejudice as a result of the unreasonable delay is shown by adequate proof."  *Am. Home Assurance, Co. v. Republic Ins. Co.*, 984 F.2d 76, 79 (2d Cir. 1993); *see also Fairmount Funding, Ltd. v. Utica Mut. Ins. Co.*, 264 A.D.2d 581, 581 (N.Y. App. Div. 1st Dep't 1999) ("Under the common-law rule, delay in giving notice of disclaimer of coverage, even if unreasonable, will not estop the insurer to disclaim unless the insured has suffered prejudice.").

Here, Plaintiff has failed to show that it suffered any prejudice in Defendant's late-issuance of its disclaimer.  (*See generally* Dkt. Nos. 30, 44.)  Indeed, Plaintiff addresses the issue of "prejudice" only in its reply memorandum of law, stating, in a footnote, that "[i]f necessary, [Plaintiff] will demonstrate at trial that it was prejudiced by [Defendant's] delay in that it was continuously pressed for information and required to submit to lengthy examinations under oath,

a costly and disruptive process." (Dkt. No. 44 at 13.) Under the circumstances, this is insufficient to raise a genuine dispute of material fact as to whether Plaintiff was prejudiced by Defendant's late disclaimer. For these reasons, Plaintiff's motion for partial summary judgment on the issue of Defendant's late disclaimer is denied.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 25) is **GRANTED** in part and **DENIED** in part, as described above in Parts III.B. through III.C. of this Decision and Order; and it is further

**ORDERED** that Plaintiff's motion for partial summary judgment (Dkt. No. 26) is **GRANTED** in part and **DENIED** in part, as described above in Parts III.D. through III.G. of this Decision and Order; and it is further

**ORDERED** that **Count Two** of Plaintiff's Complaint (Dkt. No. 1, Attach. 2) is **DISMISSED**; it is further

**ORDERED** that Defendant is **precluded from asserting the Fifth Affirmative Defense** set forth in its Answer (Dkt. No. 7); and it is further

**ORDERED** that counsel are directed to appear on **APRIL 30, 2012 at 2:00 p.m.** in chambers for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **APRIL 13, 2012**, and the parties are directed to engage in meaningful settlement negotiations prior to the 4/30/12 conference.

Dated: March 23, 2012
        Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge

39